**Arnold SCHWARZENEGGER,**
**Plaintiff–Appellant,**

v.

**FRED MARTIN MOTOR COMPANY,**
an Ohio corporation, Defendant–
Appellee,

**and**

Fred Martin Superstore, a business entity, form unknown; Zimmerman & Partners Advertising, Inc., a corporation, Defendants.

No. 02–56937.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2003.

Filed June 30, 2004.

Martin D. Singer and Charles J. Harder, Lavely & Singer, Los Angeles, CA; James C. Martin and Denise M. Howell (argued) and Benjamin G. Shatz, Reed Smith LLP, Los Angeles, CA, for the appellant.

Roy G. Weatherup (argued), Lewis Brisbois Bisgaard & Smith, LLP, Los Angeles, CA, J. Alan Warfield and Maureen Haight Gee, Haight, Brown & Bonesteel, LLP, Los Angeles, CA; and Larry J. Brock, Pollard, Archer, Cranert, Googooian & Stevens, Pasadena, CA, for the appellee.

Before: KLEINFELD, WARDLAW, and W. FLETCHER, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge.

Arnold Schwarzenegger, an internationally-known movie star and, currently, the Governor of California, appeals the district court's dismissal of his suit against Fred Martin Motor Company ("Fred Martin"), an Ohio car dealership, for lack of personal jurisdiction. Fred Martin had run a series of five fullpage color advertisements in the *Akron Beacon Journal,* a locally-circulated Ohio newspaper. Each advertisement included a small photograph of Schwarzenegger, portrayed as the "Terminator," without his permission. Schwarzenegger brought suit in California, alleging, inter alia, that these unauthorized uses of his image infringed his right of publicity. We affirm the district court's dismissal for lack of personal jurisdiction.

## I. Background

Schwarzenegger is a resident of California. When Schwarzenegger brought this suit, he was a private citizen and movie star, best known for his roles as a musclebound hero of action films and distinctive Austrian accent. As explained in his complaint, Schwarzenegger was generally cast as the lead character in so-called "stardriven" films. One of Schwarzenegger's most popular and readily-recognizable film roles is that of the title character in *The Terminator* (1984). The Terminator is a cyborg (a *cyb*ernetic *org*anism; i.e., a robot whose mechanical parts are encased in living tissue so that it appears to be human) sent back in time from a post-apocalyptic future to present-day Los Angeles to assassinate a young woman. Throughout much of the film, Schwarzenegger, as the Terminator, maintains a stern demeanor and wears black sunglasses. This image of Schwarzenegger is highly distinctive and immediately recognizable by much of the public.

Fred Martin is an automobile dealership incorporated under the laws of Ohio and located in Barberton, Ohio, a few miles southwest of Akron. There is no evidence in the record that Fred Martin has any operations or employees in California, has ever advertised in California, or has ever sold a car to anyone in California. Fred Martin maintains an Internet website that is available for viewing in California and, for that matter, from any Internet café in Istanbul, Bangkok, or anywhere else in the world.

In early 2002, Fred Martin engaged defendant Zimmerman & Partners Advertising, Inc. ("Zimmerman") to design and place a full-page color advertisement (the "Advertisement") in the *Akron Beacon Journal,* a local Akron-based newspaper. The Advertisement ran in the *Akron Beacon Journal* five times in April 2002. Most of the Advertisement consists of small photographs and descriptions of various cars available for purchase or lease from Fred Martin. Just below a largefont promise that Fred Martin "WON'T BE BEAT," the Advertisement includes a small, but clearly recognizable photograph of Schwarzenegger as the Terminator. A "bubble quotation," like those found in comic strips, is drawn next to Schwarzenegger's mouth, reading, "Arnold says: 'Terminate EARLY at Fred Martin!'" This part of the Advertisement refers to a special offer from Fred Martin to customers, inviting them to close out their current leases before the expected termination date, and to buy or lease a new car from Fred Martin.

Neither Fred Martin nor Zimmerman ever sought or received Schwarzenegger's permission to use his photograph in the Advertisement. Schwarzenegger states in his complaint that, had such a request been made, it would have been refused. The Advertisement, as far as the record

reveals, was never circulated outside of Ohio.

Schwarzenegger brought suit against Fred Martin and Zimmerman in Los Angeles County Superior Court alleging six state law causes of action arising out of the unauthorized use of his image in the Advertisement. He claims that the defendants caused him financial harm in that the use of his photograph to endorse Fred Martin "diminishes his hard earned reputation as a major motion picture star, and risks the potential for overexposure of his image to the public, thereby potentially diminishing the compensation he would otherwise garner from his career as a major motion picture star." According to Schwarzenegger's complaint, his compensation as the lead actor in star-driven films was based on his ability to draw crowds to the box office, and his ability to do so depended in part on the scarcity of his image. According to his complaint, if Schwarzenegger's image were to become ubiquitous—in advertisements and on television, for example—the movie-going public would be less likely to spend their money to see his films, and his compensation would diminish accordingly. Therefore, Schwarzenegger maintains, it is vital for him to avoid "over-saturation of his image." According to his complaint, he has steadfastly refused to endorse any products in the United States, despite being offered substantial sums to do so.

Defendants removed the action to federal district court in California, and Fred Martin moved to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The district court granted Fred Martin's motion, and Schwarzenegger timely appealed. Zimmerman is not a party to this appeal.

## II. Personal Jurisdiction

We review de novo the district court's determination that it does not have personal jurisdiction over Fred Martin. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1071 (9th Cir.2001). Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir.1990). Where, as here, the motion is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* In such cases, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir.1995). Although the plaintiff cannot "simply rest on the bare allegations of its complaint," *Amba Marketing Systems, Inc. v. Jobar International, Inc.*, 551 F.2d 784, 787 (9th Cir.1977), uncontroverted allegations in the complaint must be taken as true. *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir.1996). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.; see Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir.2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal.").

Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. *See* Fed.R.Civ.P. 4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir.1998). Because California's long-arm jurisdictional statute is coexten-

sive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. *See Panavision*, 141 F.3d at 1320 (citing Cal.Civ.Proc.Code § 410.10). For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks and citation omitted).

## A. General Jurisdiction

■ Schwarzenegger argues, quite implausibly, that California has general personal jurisdiction over Fred Martin. For general jurisdiction to exist over a nonresident defendant such as Fred Martin, the defendant must engage in "continuous and systematic general business contacts," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)), that "approximate physical presence" in the forum state. *Bancroft & Masters*, 223 F.3d at 1086. This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world. *See Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir.1986) (collecting cases where general jurisdiction was denied despite defendants' significant contacts with forum).

Schwarzenegger contends that Fred Martin's contacts with California are so extensive that it is subject to general jurisdiction. He points to the following contacts: Fred Martin regularly purchases Asian-made automobiles that are imported by California entities. (However, in purchasing these automobiles, Fred Martin dealt directly with representatives in Illinois and New Jersey, and never dealt directly with the California-based importers.) Some of Fred Martin's sales contracts with its automobile suppliers include a choice-of-law provision specifying California law. In addition, Fred Martin regularly retains the services of a California-based direct-mail marketing company; has hired a sales training company, incorporated in California, for consulting services; and maintains an Internet website accessible by anyone capable of using the Internet, including people living in California.

These contacts fall well short of the "continuous and systematic" contacts that the Supreme Court and this court have held to constitute sufficient "presence" to warrant general jurisdiction. *See Helicopteros*, 466 U.S. at 418, 104 S.Ct. 1868 ("mere purchases, even if occurring at regular intervals, are not enough" to establish general jurisdiction) (citing *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518, 43 S.Ct. 170, 67 L.Ed. 372 (1923)); *Bancroft & Masters*, 223 F.3d at 1086 (distinguishing "doing business *in* California," which may support general jurisdiction, from "doing business *with* California," which will not support such a finding) (citing *Helicopteros*, 466 U.S. at 418, 104 S.Ct. 1868) (emphases added). Schwarzenegger has therefore failed to establish a prima facie case of general jurisdiction.

## B. Specific Jurisdiction

■ Alternatively, Schwarzenegger argues that Fred Martin has sufficient "minimum contacts" with California arising from, or related to, its actions in creating and distributing the Advertisement such

that the forum may assert specific personal jurisdiction. We have established a three-prong test for analyzing a claim of specific personal jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Lake v. Lake,* 817 F.2d 1416, 1421 (9th Cir.1987). The plaintiff bears the burden of satisfying the first two prongs of the test. *Sher,* 911 F.2d at 1361. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). For the reasons that follow, we hold that Schwarzenegger has failed to satisfy the first prong.

### 1. Purposeful Availment or Direction Generally

Under the first prong of our three-part specific jurisdiction test, Schwarzenegger must establish that Fred Martin either purposefully availed itself of the privilege of conducting activities in California, or purposefully directed its activities toward California. We often use the phrase"purposeful availment," in shorthand fashion, to include both purposeful availment and

purposeful direction, *see, e.g., Harris Rutsky & Co. Insurance Services, Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1130 (9th Cir.2003) (citing *Haisten v. Grass Valley Med. Reimbursement Fund Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986)), but availment and direction are, in fact, two distinct concepts. A purposeful availment analysis is most often used in suits sounding in contract. *See, e.g., Doe v. Unocal Corp.,* 248 F.3d 915, 924 (9th Cir.2001). A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort. *See, e.g., Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002); *cf. Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995) (noting that "we apply different purposeful availment tests to contract and tort cases").

A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there. By taking such actions, a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In return for these "benefits and protections," a defendant must—as a quid pro quo—"submit to the burdens of litigation in that forum." *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174; *Coté v. Wadel,* 796 F.2d 981, 984 (7th Cir.1986) ("[p]ersonal jurisdiction over nonresidents of a state is a quid for a quo that consists of the state's extending protection or other services to the nonresident"); *see, e.g., World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (finding no personal jurisdiction in Oklahoma where defendants "avail[ed] themselves of none of the privileges and benefits of Oklahoma law").

A showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774–75, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (finding purposeful direction where defendant published magazines in Ohio and circulated them in the forum state, New Hampshire); *accord Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 899 (9th Cir. 2002) (finding purposeful direction where defendant distributed its pop music albums from Europe in the forum state, California); *see also World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559 (noting that a "forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State"); *Plant Food Co–Op v. Wolfkill Feed & Fertilizer Corp.,* 633 F.2d 155, 158–60 (9th Cir.1980) (relying on this language in *World–Wide Volkswagen* to hold that a Canadian fertilizer distributor that shipped defective or mislabeled fertilizer to Montana may properly be subject to personal jurisdiction there). The Supreme Court has held that due process permits the exercise of personal jurisdiction over a defendant who "purposefully direct[s]" his activities at residents of a forum, even in the "absence of physical contacts" with the forum. *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 (citing *Keeton,* 465 U.S. at 774–75, 104 S.Ct. 1473).

## 2. Purposeful Direction

Schwarzenegger does not point to any conduct by Fred Martin in California related to the Advertisement that would be readily susceptible to a purposeful availment analysis. Rather, the conduct of which Schwarzenegger complains—the unauthorized inclusion of the photograph in the Advertisement and its distribution in the *Akron Beacon Journal*—took place in Ohio, not California. Fred Martin received no benefit, privilege, or protection from California in connection with the Advertisement, and the traditional quid pro quo justification for finding purposeful availment thus does not apply. Therefore, to the extent that Fred Martin's conduct might justify the exercise of personal jurisdiction in California, that conduct must have been purposefully directed at California.

We evaluate purposeful direction under the three-part "effects" test traceable to the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). We recently described *Calder* and its three-part test as follows:

> *Calder* stands for the proposition that purposeful availment is satisfied even by a defendant "whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." ... [Under] *Calder,* the "effects" test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

*Dole Food,* 303 F.3d at 1111 (citations omitted).

### a. Prior Ninth Circuit Cases

In addition to *Calder* itself, Schwarzenegger particularly relies on two prior cases of this circuit that interpret *Calder.* In *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191 (9th Cir.1988), the *National Enquirer* published false stories about visits

by Frank Sinatra, the famous singer, to a Swiss clinic for "youth regeneration treatments." *Id.* at 1192. The clinic and the *National Enquirer* had made a deal whereby the clinic would supply bogus information about Sinatra to *National Enquirer* reporters during interviews conducted in Switzerland in return for the publicity it would receive by being featured in the resulting *National Enquirer* article. Sinatra sued the *National Enquirer* and the clinic in California state court for misappropriation of his name, likeness, and photograph. The action was removed to federal district court, and the clinic sought to dismiss for lack of personal jurisdiction.

We applied the three-part *Calder* effects test, stating:

> [T]he Clinic has directed its activities at California by using Sinatra's name in an effort to promote its business. The Swiss acts or directions that had a California effect consist of: (1) the misappropriation of the value of Sinatra's name through interviews conducted in Switzerland between Clinic employees and Enquirer reporters, in which the Clinic supplied false information about Sinatra's treatment at the Clinic; (2) the Clinic's California advertising efforts to attract patients; and (3) the Clinic's knowledge of Sinatra's residence in California.

*Id.* at 1195. We noted that the clinic "treated many California residents," "mounted significant advertising efforts in California" apart from the *National Enquirer* article, and that the clinic's false statements about Sinatra were "expressly calculated to cause injury in California." *Id.* at 1196, 1198. We observed without elaboration that "California is the situs of Sinatra's injury." *Id.* at 1195.

We concluded that "the misappropriation [of Sinatra's persona] is properly viewed as an event within a sequence of activities designed to use California markets for the [clinic's] benefit." *Id.* at 1197. "Therefore," we

> conclude[d] that the Clinic, through its pursuit of California clients by advertising, part of which involved the misappropriation of Sinatra's name in order to benefit the Clinic through the implied endorsement, possessed sufficient minimum contacts with California to justify the district court's exercise of jurisdiction over it.

*Id.* at 1198; *accord Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1020 (9th Cir.2002) (finding purposeful availment of Nevada under *Calder* where defendant "specifically targeted consumers in Nevada by running radio and print advertisements in Las Vegas") (internal quotation marks omitted).

In *Bancroft & Masters, Inc. v. Augusta National, Inc.,* 223 F.3d 1082 (9th Cir. 2000), Bancroft & Masters was a small California company that registered the Internet domain name "www.masters.com." Augusta National, a Georgia corporation and the host of the famous "Masters" golf tournament, allegedly sent a letter to the official domain name registrar in Virginia, challenging Bancroft & Masters's use of www.masters.com. Bancroft & Masters brought suit against Augusta National in federal district court in California for a declaratory judgment to establish its ownership of the domain name. In response, Augusta National successfully moved the district court to dismiss the action for lack of personal jurisdiction.

Bancroft & Masters appealed, and we applied the *Calder* effects test. We observed that *Calder* "cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific [personal] jurisdiction." *Id.* at 1087; *see Calder,* 465 U.S.

at 789, 104 S.Ct. 1482 ("The mere fact that [defendants] can 'foresee' that the [allegedly libelous] article will be circulated and have an effect in [the forum state] is not sufficient for an assertion of[specific personal] jurisdiction."); *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174 ("Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (quoting *World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. 559) (footnote omitted)).

We construed *Calder* to require "something more" than mere foreseeability in order to justify the assertion of personal jurisdiction in California over the Georgia defendant. *Bancroft & Masters*, 223 F.3d at 1087. The intentional act committed by Augusta National was its drafting and mailing of a letter from Georgia to Virginia. The harm was felt by Bancroft & Masters in California. We held that in sending this letter Augusta National had expressly aimed its conduct at California— even though the letter was actually sent to Virginia—"because it *individually targeted* [Bancroft & Masters in California]." *Id.* at 1088 (emphasis added); *accord California Software Inc. v. Reliability Research, Inc.,* 631 F.Supp. 1356, 1361 (C.D.Cal.1986) (finding personal jurisdiction proper where plaintiffs' complaint was that defendants intentionally and individually targeted them). We therefore reversed the district court and held that a California forum could properly assert jurisdiction over Augusta National for its act in sending the letter to Virginia.

To support our holding in *Bancroft & Masters,* we cited *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316 (9th

Cir.1998). In *Panavision,* defendant Dennis Toeppen, a resident of Illinois, had registered the Internet domain name "www.panavision.com." *Id.* at 1318–19."Panavision" was plaintiff's registered trademark, and defendant's alleged plan was to obtain money from plaintiff in exchange for the rights to www.panavision.com. In furtherance of his plan, defendant sent a letter to plaintiff in California demanding $13,000 to release his registration of www.panavision.com. *Id.* at 1323. Instead of paying defendant, Panavision sued him in federal district court in California. We sustained the exercise of personal jurisdiction:

> Toeppen did considerably more than simply register Panavision's trademarks as his domain names on the Internet. He registered those names as part of a scheme to obtain money from Panavision. Pursuant to that scheme, he demanded $13,000 from Panavision to release the domain names to it. His acts were aimed at Panavision in California, and caused it to suffer injury there.

*Id.* at 1318; *see also Cybersell,* 130 F.3d at 420 n. 6 (distinguishing *Panavision* from the facts presented in its case because while both involved a passive Internet website, the latter lacked a proactive extortion scheme).

b. Application of the *Calder* Test

■ With these cases in mind, we apply the *Calder* effects test to the present dispute. The three-part test requires that the defendant have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food,* 303 F.3d at 1111. All three parts of the test must be satisfied.

### (1) Intentional Act

Schwarzenegger must first demonstrate that Fred Martin committed an "intentional act." "Intentional act" has a specialized meaning in the context of the *Calder* effects test. We have generally applied the "intentional act" test to actions sounding in tort. *See Dole Food*, 303 F.3d at 1111 ("Under our precedents, the purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from *Calder* [ ]."); *Panavision*, 141 F.3d at 1321 (noting that the *Calder* test applies "[i]n tort cases"). The Restatement (Second) of Torts defines "act" as follows:

> The word "act" is used throughout the Restatement [ ] to denote an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended.

*Id.* § 2 (1964). "Thus, if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger and not the impingement of the bullet upon the other's person." *Id.* § 2 cmt. c. We construe "intent" in the context of the "intentional act" test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act. (The result or consequence of the act is relevant, but with respect to the third part of the *Calder* test—"harm suffered in the forum.")

In *Calder*, the intentional acts committed by the reporter and editor were the researching, writing, editing, and publishing of an allegedly libelous tabloid news article, all of which occurred in Florida. *See* 465 U.S. at 789, 104 S.Ct. 1482 ("Jurisdiction over petitioners is [ ] proper in California based on the 'effects' of their Florida conduct in California."); *see also id.* at 786 n. 4, 104 S.Ct. 1482; *id.* at 787 n. 6, 104 S.Ct. 1482. In *Sinatra*, the clinic's intentional acts were the uttering of false statements, in Switzerland, about Frank Sinatra's fictitious visits to the clinic. In *Bancroft & Masters*, Augusta National's intentional act was the sending of its complaint letter from Georgia to Virginia. Finally, in *Panavision*, defendant's intentional acts were the various acts in furtherance of his scheme to obtain money from Panavision, including registering the domain name www.panavision.com and mailing a demand letter to California. Under the Restatement and our case law, Fred Martin committed an intentional act when it placed the Advertisement in the *Akron Beacon Journal.*

### (2) Express Aiming

Schwarzenegger must also show that Fred Martin "expressly aimed" its intentional act—the placement of the Advertisement—at California. In *Calder*, the Supreme Court found that the intentional acts of the reporter and editor, though taking place in Florida, were expressly aimed at California:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources.... California is the focal point [ ] of the story....
>
> * * *
>
> [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were *expressly aimed* at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that ... the National Enquirer has its largest circulation [in California].

465 U.S. at 788–90, 104 S.Ct. 1482 (emphasis added) (footnote omitted).

The "express aiming" analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue. The reporter and editor in *Calder* were not accused of "untargeted negligence" that merely happened to cause harm to Jones. *Id.* at 789, 104 S.Ct. 1482. Rather, their actions in writing and publishing a false and injurious article about Jones's alleged drinking problem constituted intentional behavior directed at Jones in California.

In *Sinatra*, the court found that the clinic's intentional act—the uttering of false statements about Sinatra in Switzerland—was expressly aimed at California because making the statements was "an event within a sequence of activities designed to use California markets for the defendant's benefit." 854 F.2d at 1197. In *Bancroft & Masters*, the letter sent to Virginia by Augusta National "was expressly aimed at California because it individually targeted [Bancroft & Masters], a California corporation doing business almost exclusively in California." 223 F.3d at 1088. Finally, in *Panavision*, defendant Toeppen's "deliberate choice of the plaintiff's trademark, and his subsequent attempts to extort compensation for [the] domain name, targeted that individual plaintiff," a California resident. *Id.* (discussing *Panavision*, 141 F.3d at 1321).

█ Here, Fred Martin's intentional act—the creation and publication of the Advertisement—was expressly aimed at Ohio rather than California. The purpose of the Advertisement was to entice Ohioans to buy or lease cars from Fred Martin and, in particular, to "terminate" their current car leases. The Advertisement was never circulated in California, and Fred Martin had no reason to believe that any Californians would see it and pay a visit to the dealership. Fred Martin cer-

tainly had no reason to believe that a Californian had a current car lease with Fred Martin that could be "terminated" as recommended in the Advertisement. It may be true that Fred Martin's intentional act eventually caused harm to Schwarzenegger in California, and Fred Martin may have known that Schwarzenegger lived in California. But this does not confer jurisdiction, for Fred Martin's express aim was local. We therefore conclude that the Advertisement was not expressly aimed at California.[1]

## Conclusion

We hold that Schwarzenegger has established neither general nor specific jurisdiction over Fred Martin in California. Schwarzenegger has not shown that Fred Martin has "continuous and systematic general business contacts," *Helicopteros*, 466 U.S. at 416, 104 S.Ct. 1868, that "approximate physical presence" in California, *Bancroft & Masters*, 223 F.3d at 1086, such that it can be sued there for any act it has committed anywhere in the world. Further, while Schwarzenegger has made out a prima facie case that Fred Martin committed intentional acts that may have caused harm to Schwarzenegger in California, he has not made out a prima facie case that Fred Martin expressly aimed its acts at California. Because Schwarzenegger has not satisfied all three parts of the *Calder* effects test, he has not shown that Fred Martin purposefully directed his conduct at California.

We therefore AFFIRM the district court's dismissal of Schwarzenegger's complaint against Fred Martin for lack of personal jurisdiction.

█

1. Because Schwarzenegger has failed to sustain his burden with respect to the second part of the *Calder* effects test, we need not, and do not, reach the third part of the test.