SUPREME COURT OF ARIZONA
En Banc

THE PLANNING GROUP OF SCOTTSDALE, ) Arizona Supreme Court
L.L.C., an Arizona limited        ) No. CV-10-0189-PR
liability company; and ALTAIR,    )
L.L.C., an Arizona limited        )
liability company,                ) Court of Appeals
                                  ) Division One
                                  ) No. 1 CA-CV 09-0224
           Plaintiffs/Appellants, )
                                  ) Maricopa County
                v.                ) Superior Court
                                  ) No. CV2007-023622
LAKE MATHEWS MINERAL PROPERTIES,  )
LTD., a California limited        )
partnership; JAMES D. HOLMES and  )
JANE DOE HOLMES, husband and      ) **O P I N I O N**
wife; SHIRLEY SMITH and JOHN DOE  )
SMITH, wife and husband; RANDY    )
EVERS and JANE DOE EVERS,         )
husband and wife; INTEGRATED      )
RESOURCES, INC., a California     )
Corporation,                      )
                                  )
           Defendants/Appellees.  )
                                  )
_____)

Appeal from the Superior Court in Maricopa County
The Honorable J. Kenneth Mangum, Judge

**REVERSED IN PART, AFFIRMED IN PART, REMANDED**
_____

Opinion of the Court of Appeals, Division One
224 Ariz. 306, 230 P.3d 365 (App. 2010)

**VACATED**
_____

LEWIS AND ROCA LLP                                        Phoenix
     By   George L. Paul
          Thomas J. Morgan
          Stefan M. Palys
Attorneys for The Planning Group of Scottsdale, L.L.C.,
and Altair, L.L.C.

SHERMAN & HOWARD L.L.C.                                    Phoenix
      By   Daniel P. Beeks
Attorneys for Lake Mathews Mineral Properties, Ltd.,
James D. Holmes, Jane Doe Holmes, Shirley Smith,
John Doe Smith, Randy Evers, Jane Doe Evers, and
Integrated Resources, Inc.

_____

**H U R W I T Z**, Vice Chief Justice

¶1      We confront a topic that has vexed generations of law students and judges alike: determining whether the Due Process Clause of the Fourteenth Amendment permits a state court to exercise personal jurisdiction over non-resident defendants.

**I.**

**A.**

¶2      The Planning Group of Scottsdale, L.L.C., and Altair, L.L.C. (collectively "TPG"), are Arizona limited liability companies under common ownership.[1]   In 2005, Lee Subke, an Arizona resident, met in Arizona with Jeff Clark, a TPG employee, to discuss purchasing life insurance from TPG.  Subke learned that TPG also made investments and he told Clark about a California limited partnership that his sister, a California

---

[1]    The superior court did not conduct an evidentiary hearing on the defendants' motion to dismiss for lack of personal jurisdiction, but rather considered only the parties' affidavits.  We accordingly review the superior court's ruling *de novo*, viewing the facts in the light most favorable to the plaintiffs but accepting as true the uncontradicted facts put forward by the defendants.  *See Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007) (discussing review of Fed. R. Civ. P. 12(b)(2) ruling).

attorney, was representing. That partnership, Lake Mathews Mineral Properties, Ltd. ("LMMP"), was seeking investment capital for a California mining operation. Clark indicated that he would not reject any idea out of hand.

¶3 Subke contacted his sister, Shirley Smith, who in turn contacted LMMP's general partner, James Holmes, also a California resident. Holmes authorized the mailing of a "due diligence report" about the mining project to Subke for delivery to TPG. Subke brought the report to Clark and suggested that TPG's representatives talk to Smith. For introducing TPG to LMMP, Subke was later given a percentage of profits of the mining venture.

¶4 After Clark reviewed the report, he and TPG's counsel, Thomas Morgan, communicated extensively with Smith and Holmes. For several weeks, Smith and Holmes actively tried to sell the project to TPG by making telephone calls, sending e-mails, mailing letters, and transmitting faxes to Clark and Morgan in Arizona. Smith stated that LMMP intended to actively mine Lake Mathews for tin. Smith and Holmes predicted success and suggested that "huge profits" could be realized from the project.

¶5 In September 2005, Clark went to Los Angeles. He met with Holmes, Smith, and Randall Evers, LMMP's Project Manager and mining expert. Evers was the President and CEO of

3

Integrated Resources, Inc., a California corporation.  Clark was told that Holmes, Smith, and Evers were stakeholders in the venture and were contributing their work for a share of the eventual profits.

¶6    After the Los Angeles meeting, Smith faxed a document entitled "Agreement: Basic Propositions Sufficient for Immediate Funding of the Holmes Project" (the "Basic Propositions") to Clark in Arizona.  The Basic Propositions stated that TPG would provide "immediate funding – to permit the work to begin" on the mining project.  TPG was to advance up to $370,000 in several installments; the advances would draw interest at 9% per annum and each entitled TPG to an increasing share of the project's gross proceeds.

¶7    The Basic Propositions provided that they were formed "in advance of a complete and formalized Agreement."  After receiving the Basic Propositions, Reid Johnson, the owner of TPG, sent a letter to Holmes agreeing to supply the $370,000 and anticipating that "we will sign a more definitive agreement along the lines previously discussed that will . . . secure the transaction from our perspective."  Holmes responded in a letter to Johnson stating that "[t]he terms of your letter are entirely acceptable."  TPG sent an initial $100,000 payment to LMMP the next day, and $90,000 the following month.

4

¶8 Despite continuing discussions, the parties could not complete the "more definitive agreement." At some point, Morgan learned that LMMP did not intend to mine, but instead wanted to drill exploratory wells near the Metropolitan Water District's dam in an effort to extract a condemnation payment for LMMP's mineral interests.

**B.**

¶9 TPG filed a complaint in superior court against LMMP, Holmes, Subke, Smith, Evers, and Integrated Resources. As amended, the complaint had four counts, seeking (1) a declaratory judgment that TPG had obtained interests in the LMMP's mineral deposits, but had only limited liability for the mining venture, (2) damages for breach of contract, (3) damages for violating Arizona securities laws, and (4) an accounting.

¶10 All defendants but Subke (the "California defendants") moved to dismiss the amended complaint for lack of personal jurisdiction. The trial court granted the motion and entered judgment pursuant to Arizona Rule of Civil Procedure 54(b).

¶11 TPG appealed, but the court of appeals affirmed. *Planning Grp. of Scottsdale, L.L.C. v. Lake Mathews Mineral Props., Ltd.*, 224 Ariz. 306, 230 P.3d 365 (App. 2010). We granted review because the jurisdiction of Arizona courts over non-resident defendants is a recurring issue of statewide

5

importance.  We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

**II.**

**A.**

¶12     Arizona courts may exercise personal jurisdiction to the maximum extent allowed by the United States Constitution. Ariz. R. Civ. P. 4.2(a).  Therefore, "[t]he jurisdictional issue . . . hinges on federal law."  *A. Uberti and C. v. Leonardo*, 181 Ariz. 565, 569, 892 P.2d 1354, 1358 (1995).

¶13     Under the Due Process Clause of the Fourteenth Amendment, a state may exercise general jurisdiction – jurisdiction over a cause of action regardless of the relationship of its subject matter to the forum - over its own citizens, *Milliken v. Meyer*, 311 U.S. 457, 462 (1940), and over non-resident corporations whose activities in the state are "systematic and continuous," *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).  A state may also exercise specific jurisdiction – jurisdiction with respect to a particular claim – over a defendant who has sufficient contacts with the state to make the exercise of jurisdiction "reasonable and just" with respect to that claim.  *See id.*  TPG asserts that

6

Arizona courts have specific jurisdiction over the California defendants.[2]

**B.**

**¶14** *Pennoyer v. Neff*, 95 U.S. 714, 723-24 (1877), establishes that the Due Process Clause of the Fourteenth Amendment limits the exercise of personal jurisdiction by state courts over non-resident defendants. The seminal modern formulation of the due process test comes from *International Shoe*, which held that a state court may exercise personal jurisdiction over a foreign corporation only if that defendant has "sufficient contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463). This "minimum contacts" test also applies to natural persons. *Shaffer v. Heitner*, 433 U.S. 186, 204 n.19 (1977). Under this test, the defendant need not ever have been physically present in the forum state. *Int'l Shoe,* 326 U.S. at 316. Rather, the question is whether the defendant's contacts with the forum, physical or otherwise, "make it reasonable, in the context of our federal system of government, to require the [defendant] to defend the particular suit which is brought there." *Id.* at 317.

---

[2] Subke, an Arizona citizen, did not file a motion to dismiss.

¶15     "[T]he facts of each case must [always] be weighed in determining whether personal jurisdiction would comport with fair play and substantial justice." *Burger King v. Rudzewicz*, 471 U.S. 462, 485-86 (1985) (alteration in original) (internal quotation marks omitted).  The need for case-by-case analysis obviously renders previous opinions of less than definitive guidance.  But the Supreme Court has explicated the *International Shoe* test in a series of decisions, most notably *Hanson v. Denckla*, 357 U.S. 235 (1958), *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), *Burger King,* and *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), which provide the framework for specific jurisdiction analysis.

¶16     Under that jurisprudence, casual or accidental contacts by a defendant with the forum state, particularly those not directly related to the asserted cause of action, cannot sustain the exercise of specific jurisdiction.  *See World-Wide Volkswagen*, 444 U.S. at 295; *Int'l Shoe Co.*, 326 U.S. at 317.  Nor can the requisite contacts be established through the unilateral activities of the plaintiff; they must instead arise from the defendant's "purposeful" conduct.  *Burger King*, 471 U.S. at 475-76; *World-Wide Volkswagen*, 444 U.S. at 297; *Hanson*, 357 U.S. at 253.

¶17     In explaining the minimum contacts concept, the Court has used various phrases.  *See Asahi*, 480 U.S. at 112 (O'Connor,

8

J., plurality opinion) ("[M]inimum contacts must come about by an action of the defendant purposefully directed toward the forum State." (emphasis omitted)); *Burger King*, 471 U.S. at 474 (considering "whether the defendant purposefully established 'minimum contacts' in the forum State"); *id.* at 482 (considering "whether a defendant has purposefully invoked the benefits and protections of a State's laws" (internal quotation marks omitted)); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) (finding defendant's course of conduct "purposefully directed" at the forum state); *Hanson*, 357 U.S. at 253 (requiring "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws").

## C.

¶18      In this case, the court of appeals relied primarily on recent decisions of the United States Court of Appeals for the Ninth Circuit. *Planning Grp.*, 224 Ariz. at 313-14 ¶¶ 14-16, 230 P.3d at 372-73.  That court has held that "purposeful availment" and "purposeful direction" are distinct tests, the former to be applied to contract claims and the latter to tort claims. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  *Schwarzenegger* derived the "purposeful availment" language from *Hanson*, 357 U.S. at 253, and the "purposeful

9

direction" concept from *Keeton*, 465 U.S. at 774-75, and *Calder v. Jones*, 465 U.S. 783 (1984). *Schwarzenegger*, 374 F.3d at 802-03. For contract claims, the Ninth Circuit asks whether the defendant "perform[ed] some act by which he purposefully avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *See id.* at 802. For tort claims, the court considers whether the defendant "purposefully direct[ed] his activities or consummate[d] some transaction with the forum or resident thereof." *See id.*

¶19    Under the Ninth Circuit approach, when several claims arise from a single set of contacts, a court first determines whether the complaint sounds primarily in contract or in tort. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). The Ninth Circuit then analyzes the entire suit under the standard applicable to the primary source of the dispute. *Id.* at 1016-17 (finding complaint to sound primarily in contract and employing "purposeful availment" test for all claims).[3]

¶20    Relying primarily on *Schwarzenegger* and *Boschetto*, the opinion below first analyzed whether TPG's complaint sounded primarily in tort or contract. *Planning Grp.*, 224 Ariz. at 314

---

[3]    If claims arise from different sets of contacts, the Ninth Circuit analyzes each claim separately. *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n.8 (9th Cir. 1977).

10

¶ 19, 230 P.3d at 373. The court found that the suit sounded primarily in contract because "Plaintiffs filed suit to collect on interests outlined in [the] Basic Propositions" and "the very basis of the securities fraud claim is the contract between the parties." *Id.* at 315 ¶ 21, 230 P.3d at 374. The court of appeals accordingly applied the "purposeful availment" test to the entire complaint. *Id.*

**¶21** The court of appeals then analyzed four factors described in *Burger King*, 471 U.S. at 478-79 – the "qualitative facts relating to the negotiations, terms of the contract, the parties' actual course of dealing and contemplated future consequences" - to determine whether the California defendants "availed" themselves of the privilege of doing business in Arizona. *Planning Grp.*, 224 Ariz. at 315 ¶ 23, 230 P.3d at 374. It found that the in-person contract negotiations took place in California, the contract concerned a California mining operation, the California defendants wished to conduct business in California, and the future consequences hinged upon whether the California mining operation was profitable. *Id.* at 315-18 ¶¶ 24-34, 230 P.3d at 374-77. The court therefore concluded that the California defendants had not "purposefully availed themselves of the privilege of conducting business in Arizona," *id.* at 319 ¶ 39, 230 P.3d at 378, and affirmed the superior

11

court's judgment dismissing the complaint, *id*. at 320 ¶ 44, 230 P.3d at 379.[4]

## III.

**¶22** We find the analytical framework used by the court of appeals problematic in some respects. Although we often find decisions of the Ninth Circuit persuasive, they are not binding on this Court. *State v. Montaño*, 206 Ariz. 296, 297 n.1 ¶ 1, 77 P.3d 1246, 1247 n.1 (2003). The *Schwarzenegger* rubric is of relatively recent vintage. *Schwarzenegger*, 374 F.3d at 802 (acknowledging that the Ninth Circuit had previously "often use[d] the phrase 'purposeful availment,' in shorthand fashion, to refer to both purposeful availment and purposeful direction"); Peter Singleton, Note, *Personal Jurisdiction in the Ninth Circuit*, 59 Hastings L.J. 911, 926 (2008) (noting that before *Schwarzenegger*, the Ninth Circuit had not treated purposeful availment and purposeful direction as separate tests). And, although *Schwarzenegger* cites *Calder* and *Keeton* in support of its conclusion that the Supreme Court has developed two separate tests, *Schwarzenegger*, 374 F.3d at 802-03, no Supreme Court case actually so holds. Indeed, in *Burger King*, decided three years after *Calder* and one year after *Keeton*, the

---

[4] The court of appeals also rejected the claim that Arizona courts had jurisdiction because Subke was the agent of the California defendants, finding no evidence of agency. *Planning Grp.*, 224 Ariz. at 319 ¶¶ 37-38, 230 P.3d at 378.

12

Court interchangeably used several constructions - "purposefully directed," "purposefully established," "purposeful availment," and "purposefully invoked" - in evaluating a case involving tort and contract claims. *Burger King*, 471 U.S. at 472, 474, 475, 482.

¶23    We do not dispute that purposeful availment analysis is typically most useful in analyzing personal jurisdiction for contract claims, and purposeful direction for tort claims. Tort suits do not often involve prior negotiations or contract terms, two of the elements examined in *Burger King* in determining purposeful availment. 471 U.S. at 479. Nor do contract cases typically turn on the location of the effects of a defendant's conduct, a factor upon which the Court relied in *Calder* in determining purposeful direction. 465 U.S. at 789.

¶24    But we cannot agree that a court, in evaluating personal jurisdiction, must characterize an entire complaint as primarily sounding either in contract or tort. Under such an approach, if TPG had brought only its tort claims and purposeful direction were established, Arizona courts would have personal jurisdiction over the California defendants. That jurisdiction should not be defeated simply because the plaintiffs also assert contract claims.

¶25    Moreover, we do not believe that if purposeful direction is established with respect to a tort claim, a

13

contract claim arising out of precisely the same set of facts is somehow placed beyond the constitutional purview of Arizona courts. The issue, after all, is whether the aggregate of the defendants' contacts with this state makes it fair and reasonable to hale them into court here with respect to claims arising out of those contacts. *See Burger King*, 471 U.S. at 474 ("[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."). In our view, the Supreme Court cases embody a holistic approach, which in the end poses a single (although sometimes not easily answered) question: Considering all of the contacts between the defendants and the forum state, did those defendants engage in purposeful conduct for which they could reasonably expect to be haled into that state's courts with respect to that conduct? If such minimum contacts exist, the defendant can fairly be expected to respond to all claims arising out of those contacts, whatever the plaintiff's theory of recovery.

**IV.**

**A.**

¶26    We therefore turn to the contacts between the California defendants and this state. After Holmes learned that the Arizona companies might be interested in the investment opportunity, he sent a copy of the due diligence report to Subke

14

in Arizona with instructions to deliver it to TPG. Smith and Holmes then directed a series of telephone calls, e-mails, faxes, and letters to the Arizona plaintiffs, seeking to persuade the plaintiffs to invest in the mining venture. After face-to-face negotiations took place in California, Holmes sent the Basic Propositions to TPG in Arizona. After TPG accepted the offer in the Basic Propositions, Holmes sent a letter to Johnson in Arizona agreeing with Johnson's characterization of the preliminary understanding. Although the parties were unable to arrive at a more definitive agreement, it seems clear that the California defendants borrowed money from investors located in Arizona after extensive communications directed toward those investors in this state and after sending a basic proposal to TPG here.

¶27 It is true, as the court of appeals noted, that many contacts between TPG and the California defendants took place either in California or because TPG directed communications into that state. But personal jurisdiction is not a zero-sum game; a defendant may have the requisite minimum contacts allowing the exercise of personal jurisdiction by the courts of more than one state with respect to a particular claim. The analysis is not concluded simply because contacts with one state predominate over those with another.

15

¶28    The court of appeals minimized the import of the telephone calls, e-mails, faxes, and letters directed by the California defendants toward Arizona, citing *Federated Rural Electric Insurance Co. v. Inland Power and Light Co.*, 18 F.3d 389 (7th Cir. 1994), and *Roth v. Marquez*, 942 F.2d 617 (9th Cir. 1991). *Planning Grp.*, 224 Ariz. at 315-16 ¶ 24, 230 P.3d at 374-75.    But *Federated Rural Electric* involved a single telephone call by the defendant's agent to the plaintiff inviting attendance at a meeting outside the forum state, a call that the Seventh Circuit held not to constitute a solicitation under Wisconsin's long-arm statute. *Federated Rural Elec. Ins. Co.*, 18 F.3d at 392-93.    *Roth* is even further afield.    There, the Ninth Circuit *upheld* California personal jurisdiction in a case in which a contract for film rights was negotiated largely by an exchange of faxes between the California plaintiff and non-resident defendants and where the bulk, although not all, of the face-to-face negotiations occurred outside that state.    942 F.2d at 619-25.    Neither case assists our analysis today.

¶29    The court of appeals also analyzed individual contacts to determine whether each alone sufficed to establish personal jurisdiction. *Planning Grp.*, 224 Ariz. at 316 ¶ 24, 230 P.3d at 375 (communications "alone are not sufficient"); *id.* at 317 ¶ 32, 230 P.3d at 376 ("mere negotiation and execution of a contract are insufficient"); *id.* at 318 ¶ 33, 230 P.3d at 377

16

("[a]lthough Basic Propositions required Nonresident Defendants to send royalties to Plaintiffs in Arizona, this is insufficient to establish personal jurisdiction"); *id.* at 319 ¶ 37, 230 P.3d at 378 ("Subke merely received authorization from Holmes to deliver the [due diligence report]. . . . [t]his is insufficient"). But jurisdictional contacts are to be analyzed not in isolation, but rather in totality. *See Burger King*, 471 U.S. at 482 (contract's choice of law provision "standing alone would be insufficient to confer jurisdiction," but "when combined with the 20-year interdependent relationship . . . it reinforced [Rudzewicz's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there").

### 1.

¶30 TPG's securities law claim rests on the contention in the first amended complaint that the California defendants "made material misrepresentations of fact and omitted to state facts which were necessary for disclosure in order to make the transaction not misleading." TPG's affidavits claim that many of those representations were made during communications by Holmes and Smith to TPG and its representatives in Arizona. Holmes directed Subke to deliver the due diligence report to Clark in Arizona, and thereafter Holmes and Smith repeatedly contacted TPG's representatives in this state.

17

¶31    These communications were no doubt purposeful and directed at individuals and entities that Holmes and Smith, acting on behalf of LMMP, knew to be in Arizona.  Because it relied on Ninth Circuit precedent, the court of appeals never evaluated these facts to determine whether they indicated purposeful direction of activities toward this state by the California defendants.  We have little difficulty in concluding that they show purposeful direction.  The plaintiffs' affidavits state that these representations played an important role in the investment decision, and their jurisdictional significance is not obviated by the fact that later representations in California also played a role.

## 2.

¶32    Because we find purposeful direction with respect to the misrepresentation claims, we also find no constitutional barrier to the exercise of jurisdiction over contract claims arising from the same set of operative facts.  But, even if we were to analyze TPG's contract claims separately under a purposeful availment rubric, we would arrive at the same result.

¶33    This case in the end involves an alleged loan by Arizona corporations to a California venture, with repayment to be made in Arizona.  As such, we find *Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217 (3d Cir. 1992), particularly instructive.  In that case, a group of out-of-state investors obtained a loan

18

from a Pennsylvania bank. After default, the bank sued the investors in Pennsylvania. The defendants had never dealt with the bank in Pennsylvania or traveled to Pennsylvania during the loan process, but rather had negotiated the loan with the bank's District of Columbia branch through a mortgage broker. *Id.* at 1219. The Third Circuit nonetheless found specific personal jurisdiction because the defendants knew they were dealing with a Pennsylvania company, negotiated and corresponded with that company, and had continuing obligations to repay the loan in Pennsylvania. *Id.* at 1223.

¶34 The court below distinguished *Mellon Bank* because the investors there sought out the Pennsylvania bank, while LMMP contacted TPG only after Clark expressed some interest to Subke in hearing more about an investment opportunity. *Planning Grp.*, 224 Ariz. at 318 ¶ 34, 230 P.3d at 377. But here, although Subke introduced the parties to each other, LMMP (through Holmes and Smith) actively sought thereafter to make a deal with the Arizona plaintiffs. As in *Mellon Bank*, the eventual contract was to borrow money from entities the defendants knew were located in another state, with the loan to be repaid with interest in that state. As in *Mellon Bank*, the enterprise that would allow the defendants to repay the loan was outside the forum state, but the contract itself has sufficient relationship to the forum state to support specific jurisdiction.

19

¶35    In *Burger King*, the Supreme Court stated that "with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities."  471 U.S. at 473 (internal quotation marks omitted).  The bulk of the negotiations in *Burger King* between the defendants (Michigan residents) and the plaintiff (a Florida corporation) occurred over the phone, by letter, or with the corporation's Michigan representatives.    The defendants signed the contract in Michigan, where it was to be performed.  The Supreme Court nonetheless found personal jurisdiction in Florida appropriate, in large part because the defendants knew that they had entered into a continuing relationship with a corporation located in that state.  *Id.*

¶36    A different result is not warranted here.  Even if examined separately under the purposeful availment test, the purposeful contacts of LMMP, Holmes, and Smith with this state are sufficient to support the exercise of personal jurisdiction in Arizona with respect to TPG's contract claims.

**3.**

¶37    In *Asahi*, the Supreme Court stressed that minimum contacts with the forum state do not end the personal

jurisdiction constitutional analysis. Although a finding of such contacts will most often mean that the "interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant," 480 U.S. at 114, the Court emphasized that the ultimate "determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors," *id.* at 113. These include "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id.* A court "must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 292).

¶38    In *Asahi*, the exercise of jurisdiction was found unreasonable despite the assumed existence of the requisite minimal contacts between the foreign defendant and the forum state. But there, the defendant was a Japanese corporation, the only remaining plaintiff was a Taiwanese corporation, the relevant transaction took place in Taiwan, and the substantive policies of other nations regarding products liability and indemnification were implicated by the California-based litigation. *Id.* at 114-15. The Supreme Court relied on the

21

"international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State" in finding that "the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair." *Id.* at 116.

¶39        No such factors militate against Arizona jurisdiction here.  The plaintiffs are Arizona limited liability companies, the securities claim is premised on Arizona law, and the moving defendants are located in a neighboring state.  This is thus not the unusual case in which the exercise of personal jurisdiction over LMMP, Holmes, and Smith would be unfair despite the existence of minimum contacts with this state arising from those defendants' purposeful activities.[5]

**4.**

¶40        We reach a contrary conclusion, however, as to Evers and Integrated Resources.  TPG has identified no purposeful conduct by Evers or his corporation that either took place in this state or was directed at this forum.  Although Evers prepared the due diligence report, he did so before Subke's contact with Clark, and there is no evidence that he was aware that the report was to be sent to Arizona.  Evers directed no communication - oral, written, or otherwise - into Arizona.  At

---

[5]    We therefore need not consider TPG's claims that Arizona jurisdiction is also appropriate because Subke acted as an agent of those defendants.

22

most, he was involved in the California face-to-face negotiations and could have received profits from the mining venture. Neither fact shows purposeful activity directed toward this state.

¶41    TPG contends that Evers knew he was dealing with Arizona residents at the Los Angeles negotiations. But it is not enough that a defendant know that he is dealing with an Arizona resident then located in another state; the requisite activity must instead be purposefully directed at the forum. *Burger King*, 471 U.S. at 474. Otherwise, a California resident who collides on the highways of that state with a car that he knows to have an Arizona license plate would subject himself to personal jurisdiction here, despite the lack of any other contact with this state. The Supreme Court's decisions justify no such conclusion. In *Hanson*, for example, the Court concluded that personal jurisdiction in Florida was not appropriate despite the defendant's knowledge that he was dealing with a party who resided there. 357 U.S. at 251.

**V.**

¶42    For the reasons above, we affirm the superior court's judgment dismissing the claims against Evers and Integrated Resources for lack of personal jurisdiction, but reverse the judgment insofar as it dismisses the claims against LMMP, Holmes, and Smith. The opinion of the court of appeals is

23

vacated and this case is remanded to the superior court for further proceedings consistent with this opinion. LMMP's request for attorney's fees under A.R.S. § 12-341.01(A) is denied.

                              _____
                              Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice


_____
Michael D. Ryan, Justice (Retired)