Lawrence J. WARFIELD, Receiver for CP Direct, Inc., Plaintiff,

v.

Marc A. GARDNER; North American Bancard, Inc., a Michigan corporation, Defendants.

No. CV 04–0974–PHXJAT.

United States District Court, D. Arizona.

Oct. 29, 2004.

Ryan W. Anderson, Guttilla & Murphy PC, Phoenix, AZ, for Plaintiff.

Stephen M. Dichter, James Demosthenes Smith, Jennifer Ann Simmon, Bryan Cave LLP, Phoenix, AZ, for Defendants.

**1036**

## ORDER

TEILBORG, District Judge.

Pending before the Court are Defendants Marc A. Gardner and North American Bancard, Inc.'s ("NAB"): (1) "Motion to Dismiss Complaint (1) for Improper Venue, (2) for Lack of Personal Jurisdiction, or (3) Transfer Venue" (Doc. # 6); (2) Motion to Dismiss RICO Claim (Doc. # 7); and (3) Motion to Dismiss Conversion Claim (Doc. # 8). Plaintiff Lawrence J. Warfield has filed Responses to each of the Defendants' Motions (Docs. ## 11, 12, 13), and the Defendants have filed Replies in support of their Motions (Docs. ## 17, 18, 19). Because the Court finds that it has personal jurisdiction over the Defendants, and that Plaintiff has sufficiently pled a conversion claim, it will deny the Defendants' Motions to Dismiss with respect to those issues. Further, because the Court finds that transfer of this case to a different venue is unwarranted, it will deny the Defendants' request for transfer. Finally, because the Court finds that Plaintiff has failed to sufficiently plead a RICO claim, it will grant the Defendant's Motion to Dismiss RICO Claim, but will grant Plaintiff leave to amend to attempt to cure the deficiencies.

## I. Background

In September 2002, the State of Arizona filed a Complaint against CP Direct, Inc. ("CP") and its owners, Michael Consoli and Vincent Passafiume, alleging violations of the Arizona Racketeering Act. Plaintiff is the Court-appointed Receiver for the "Receivership Defendants" in that matter, a group that includes CP and its owners. While in existence, CP was a Nevada corporation operating in Arizona. (Compl. at

¶ 1.) Defendant NAB is a Michigan corporation. (*Id.* at ¶ 15.) Defendant Gardner is NAB's president and a Michigan resident. (*Id.* at ¶ 14.)

CP formerly marketed and sold nutritional supplements, including a penis enlargement pill known as "Longitude", with sales totaling $77,627,615.99. (*Id.* at ¶¶ 19.) Approximately 86% of CP's total sales were comprised of credit card transactions. (*Id.* at ¶ 20.) Because CP could not process its credit card transactions directly, it needed the services of an intermediary agent. (*Id.* at ¶ 21.) Toward this end, in December 2000, CP contracted with NAB to process its credit card transactions through Global Payment Services ("GPS"). (*Id.* at ¶ 20.) In return, CP agreed to pay NAB 2.68% of each credit card sale it processed through GPS, as well as various other fees and costs for NAB's services. (*Id.* at ¶ 22.)

Pursuant to its agreement with GPS, NAB was required to supervise CP's credit card processing, including the calculation CP's chargeback ratio. (*Id.* at ¶ 23.) This calculation represented the percentage of CP's customers who requested their credit card company to refund money paid to CP.[1] (*Id.*) Within a year after contracting with NAB, GPS placed CP on its watchlist. (*Id.* at ¶ 24.) Subsequently, in February 2002, GPS discontinued processing CP's credit card transactions because CP had exceeded the 1% chargeback ratio for three consecutive months. (*Id.* at ¶ 26.) CP thereafter contracted with alternative credit card processors, but was unable to obtain services enabling it to continue its business at its pervious levels. (*Id.* at ¶ 28.)

---

1. Apparently, if a merchant's chargeback ratio exceeds 1% of its total sales, credit card processors, like GPS, place the merchant on a watchlist and may eventually discontinue processing the merchant's credit card transactions if the chargeback ratio remains at that level for a period of time. (*Id.*)

Plaintiff alleges that around this time, Defendants informed CP that by creating a new company and hiding the fact that CP controlled it, CP could avoid its negative chargeback history and resume processing its transactions through GPS. (*Id.* at ¶¶ 30–31.) Toward this end, and at the Defendants' direction, CP devised a fictitious entity called Nutritional Supplements, Inc., ("NSI"). (*Id.* at ¶ 31.) Defendants also directed Consoli to provide NAB with various documents purporting to show that NSI was unrelated to CP. (*Id.* at ¶ 32.) Specifically, NAB directed Consoli to create fraudulent documents to establish that NSI existed and was a going concern, including a forged corporate charter, checks, and forged and fraudulently-prepared state and federal tax returns for NSI. (*Id.*) Additionally, CP submitted a merchant account application in the name of NSI to Defendants containing fraudulent information in order for CP, as NSI, to obtain a credit card processing account with GPS. (*Id.* at ¶ 34.) Defendant Gardner thereafter presented NSI's application to GPS without disclosing that NSI was a non-existent company. (*Id.* at ¶ 35.) Defendant Gardner also represented to GPS that NSI had a licensing agreement with CP that gave it the right to sell Longitude, a document which did not exist at the time. (*Id.*) Based on the Defendants' representations, GPS accepted NSI as a client and began processing its credit card transactions in February 2002. (*Id.*) The following month, Defendants informed CP's attorney that GPS was going to audit NAB's client files, and asked him to draft a licensing agreement granting NSI a license to sell Longitude in order to cover up the actual relationship between CP and NSI. (*Id.* at ¶ 36.)

As a condition of processing CP's (as NSI) credit card purchases for Longitude, Defendant Gardner demanded that CP pay a monthly consulting fee of up to $250,000, with additional bonuses. (*Id.* at ¶ 37.) The bonus arrangement provided that Gardner would receive an additional $50,000 for every million dollars of sales over eight million dollars per month. (*Id.* at ¶ 38.) Although Gardner provided no consulting services, in order to continue processing its credit card transactions through GPS, CP paid Gardner $700,000 from CP's funds in three installments during March and April 2002. (*Id.* at 44.) CP ended the payments when the State of Arizona filed the receivership action. (*Id.* at 46.)

On May 12, 2004, Plaintiff filed this lawsuit, asserting three claims against the Defendants for: (1) civil RICO violations; (2) conversion; and (3) unjust enrichment. He seeks judgment against the Defendants in the amount of $700,000, plus interest. Alternatively, Plaintiff seeks judgment for $2,100,000, as treble damages pursuant to Arizona Revised Statutes ("A.R.S.") § 13–2314.04, plus interest. The Defendants now move to dismiss the Complaint on several grounds.

## II. The Defendants' Motion to Dismiss Complaint (1) For Improper Venue, (2) For Lack of Personal Jurisdiction, or (3) Alternatively, to Transfer Venue

### A. Personal Jurisdiction

The Defendants first urge the Court to dismiss Plaintiff's Complaint because the Court lacks personal jurisdiction over them.[2]

---

2. Although the Defendants initially moved to dismiss Plaintiff's Complaint on the ground that the District of Arizona was not the proper venue for the action, they have withdrawn that argument in their Reply. (Reply at 1 n. 1.) The Court will therefore turn to their other arguments.

 When a defendant moves to dismiss a complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir.2004). If the Court rules on the motion based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* In such cases, the Court examines whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction. *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir.1995). "Although the plaintiff cannot 'simply rest on the bare allegations of its complaint,' uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (internal citations omitted). Further, the Court resolves conflicting statements in the parties' affidavits in the plaintiff's favor. *Id.*

 A district court sitting in diversity has personal jurisdiction over a defendant to the extent provided by the law of the forum state. *Data Disc, Inc. v. Sys. Tech. Associates*, 557 F.2d 1280, 1286 (9th Cir. 1977). Arizona's long-arm statute provides for personal jurisdiction coextensive with the limits of federal due process. Ariz. R. Civ. P. 4.2(a); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997); *Cohen v. Barnard, Vogler & Co.*, 199 Ariz. 16, 13 P.3d 758, 760 (App.2000). Thus, the Court's analysis of personal jurisdiction under Arizona's long-arm statute and the federal Constitution collapse into one, and the Court considers only whether the exercise of jurisdiction over Defendants comports with due process. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir.2002). Specifically, to satisfy constitutional due process, the non-resident defendant "must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.' " *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Depending on the nature of the Defendants' contacts with Arizona, the Court may exercise either general or specific jurisdiction over them. Because Plaintiff has not presented any argument in support of general jurisdiction, the Court will examine whether specific jurisdiction exists. (*See* Resp. at 5.)

 "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum." *Glencore Grain Rotterdam B.V.*, 284 F.3d at 1123. The Court applies a three-part test when analyzing a claim of specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir.2000). Plaintiff bears the burden of satisfying the first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802. If Plaintiff fails under either prong, the

Court must find that personal jurisdiction does not exist in the forum state. *Id.* If Plaintiff satisfies both prongs, the burden shifts to the Defendants to "present a compelling case" demonstrating that the exercise of jurisdiction would be unreasonable. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

### 1. Purposeful Availment or Direction

Plaintiff must initially demonstrate that the Defendants either purposefully availed themselves of the privilege of conducting activities in Arizona, or purposefully directed their activities toward Arizona. *Id.* Generally, "[t]his 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third person.'" *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174 (internal citations omitted). In making this determination, the Court applies different purposeful availment tests depending on whether the plaintiff's case sounds in tort or contract. *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995). The Court generally undertakes a purposeful availment analysis in contract-based lawsuits, and a purposeful direction analysis in lawsuits sounding in tort. *Schwarzenegger,* 374 F.3d at 802.

"A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* In this way, a defendant "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and privileges of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In exchange for the forum state's benefits and protections, the defendant must submit to the burdens of litigation in the forum state. *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. 2174.

"A showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum[.]" *Schwarzenegger,* 374 F.3d at 803. The Court assesses purposeful direction under the tripartite effects test set forth in *Calder v. Jones,* 465 U.S. 783, 788–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Under this test, the plaintiff must prove that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002).

Here, the parties disagree as to the appropriate test. Plaintiff asserts that because the Complaint rests wholly on tort-type claims, the effects test applies. In opposition, the Defendants contend that because Plaintiff's claims arise out of CP and NSI's contractual relationship with NAB, the purposeful availment test applies.

As indicated above, the Ninth Circuit generally applies a purposeful direction analysis in tort-based cases. *See Ziegler,* 64 F.3d at 473 (holding that effects test applied to § 1983 claim because it is "more akin to a tort claim than a contract claim"); *Bancroft & Masters,* 223 F.3d at 1087 (applying effects test to declaratory judgment action involving trademark infringement); *Panavision Int'l v. L.P. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998) (applying effects test to trademark infringement and unfair competition claims); *Caruth,* 59 F.3d at 128 n. 1 (applying effects test to defamation, tortious interference with business relations, and intentional infliction of emo-

tional distress claims); *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1259 (9th Cir.1989) (applying effects test to defamation and tortious interference with contract claims). In this case, Plaintiff's Complaint asserts tort-based claims based on the Defendants' allegedly unlawful conduct, thereby supporting application of the effects test.

█ The Defendants, on the other hand, maintain that Plaintiff's claims stem from CP's contractual relationship with them, making the purposeful availment test appropriate, and cite several cases in support. However, in each of the cases that the Defendants cite where the court applied the purposeful availment test, the plaintiff had alleged tort claims *in addition to* contract-based claims. *See Gray & Co. v. Firstenberg Machinery Co.*, 913 F.2d 758, 760 (9th Cir.1990) (action for misrepresentation, rescission, and breach of warranty); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir.1988) (action for antitrust violations, breach of contract, and "related torts"). In this case, although CP and NAB had a contract, Plaintiff has not asserted any claims arising from the parties' performance under that contract or any tortious actions affecting the contact. Instead, the Complaint is premised on the Defendants' alleged actions after GPS stopped processing CP's credit card transactions, an act which severely frustrated, if not terminated the parties' contract. Thus, the Defendants' alleged conduct of engaging in a racketeering enterprise and converting CP's funds do not arise or relate to the contract or the parties' contractual relationship. The Court therefore agrees with Plaintiff that a purposeful directions analysis which focuses on the effects of the Defendants' actions is appropriate.

Under the effects test, Plaintiff must first show that the Defendants committed an intentional act. Reviewing the Complaint, Plaintiff has alleged that the Defendants directed CP to create a fraudulent corporation and then "demanded a monthly 'consulting fee' of up to [$250,000] per month with additional bonuses." (Compl. at ¶¶ 31, 32, 37.) Additionally, Plaintiff alleges that the Defendants "intentionally exercised control over Plaintiff's property." (Compl. at ¶ 55.) Thus, Plaintiff has sufficiently alleged that the Defendants committed intentional acts. *See Panavision*, 141 F.3d at 1322 (finding that defendant's acts of registering of plaintiff's trademarks as his domain name on Internet in an effort to extort money from plaintiff sufficient under effects test).

Second, Plaintiff must show that the Defendants "expressly aimed" their intentional acts at Arizona. "That requirement is satisfied when 'the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'" *Dole Food Co.*, 303 F.3d at 1111 (quoting *Bancroft & Masters*, 223 F.3d at 1087). "The 'expressly aiming' analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue." *Schwarzenegger*, 374 F.3d at 807. For instance, in *Bancroft & Masters*, the court held that ANI's letter sent to a domain name registrar in Virginia challenging Bancroft & Masters use of a domain name was expressly aimed at California because it individually targeted Bancroft & Masters, a California corporation doing business almost exclusively in California. 223 F.3d at 1088. In contrast, in *Schwarzenegger*, the court held that California lacked personal jurisdiction over the defendant because his intentional act— the creation and publication of an advertisement using Arnold Schwarzenegger's likeness—was expressly aimed at Ohio car

buyers rather than California consumers. 374 F.3d at 807.

In this case, the Complaint alleges that the Defendants directed CP and its president to devise NSI and to provide NAB with various fraudulent documents. It further alleges that, "[a]s a condition of processing CP, as NSI's, credit card purchases for Longitude, Gardner demanded a monthly 'consulting fee' ... with additional bonuses," and "forced CP to pay these 'consulting fees' to continue processing CP, as NSI's credit card transactions." (Compl.¶¶ 37, 39.) Additionally, the Complaint alleges that CP was "a Nevada corporation, doing business in the State of Arizona." (Compl. at ¶ 1.) In his Declaration, Plaintiff avers that CP's business records, including records relating to the transaction between CP and the Defendants and those prepared for NSI, have Scottsdale, Arizona addresses listed for both CP and NSI. Based on these allegations, Plaintiff has sufficiently alleged that the Defendants knew that CP was operating in Arizona and that they communicated with CP and its owners in Arizona for the purpose of directing CP to devise a fraudulent corporation and to extort fees from CP. *See Dole,* 303 F.3d at 1112 (finding "express aiming" prong met when defendants were "alleged to have communicated with [plaintiff's] managers in California with the specific intent to cause injury to [plaintiff] by means of those very communications"); *see also Panavision Int'l,* 141 F.3d at 1322 (finding that defendant directed his activity at forum state by registering plaintiff's trademark as his domain name and demanding that plaintiff pay him $13,000 in exchange for the domain name). Accordingly, Plaintiff has established the second prong.

Third, Plaintiff must allege that the harm the Defendants caused was suffered in Arizona. Although there is some uncertainty in the Ninth Circuit about the quantum of harm the plaintiff must suffer in the forum state, generally, courts require the plaintiff to show that it incurred the "brunt of the harm" in the forum state. *See Dole,* 303 F.3d at 1112–1113; *Panavision Int'l,* 141 F.3d at 1322. Here, Plaintiff has alleged that CP paid the Defendants from CP's Arizona Wells Fargo Bank account and wire transferred funds to Gardner's account from Arizona. Thus, Plaintiff has adequately alleged that it bore the brunt of the harm in Arizona.

■ Based on the preceding analysis, the Court finds that Plaintiff has satisfied the three elements of the effects test, thereby establishing the purposeful availment prong necessary for this court to exercise specific jurisdiction over the Defendants. The Court will therefore analyze the remaining two prongs.

### 2. "Arising out of" Prong

The Court applies a "but for" test to determine whether a particular claim arises out of forum-related activities. *Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir.1995). In this case, but for the Defendants' intentional communications with CP in Arizona directing it to create NSI and demanding consulting fees, Plaintiff's claims against Defendants would not have arisen. Thus, the Defendants' alleged unlawful conduct is directly related to Plaintiff's claims. Plaintiff has therefore alleged facts satisfying this prong.

### 3. Reasonableness

Finally, the Court must determine whether exercise of its specific personal jurisdiction is reasonable. An unreasonable exercise of jurisdiction violates the Due Process Clause even if the "purposeful availment" and "arising out of" requirements of the specific jurisdiction test are satisfied. *See Int'l Shoe,* 326 U.S. at 316,

66 S.Ct. 154 (holding that exercise of personal jurisdiction must "not offend traditional notions of fair play and substantial justice"). However, the Court presumes that its exercise of jurisdiction over a defendant is reasonable if the plaintiff successfully establishes the first two prongs of the specific jurisdiction test. *Ballard,* 65 F.3d at 1500. To avoid jurisdiction, the Defendants must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

■ Toward this end, the Ninth Circuit considers the following seven factors to determine whether the exercise of specific jurisdiction over a defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Ziegler,* 64 F.3d at 475. The Defendants contend that the Court's exercise of personal jurisdiction in this case would be unreasonable. Applying the forgoing factors, the Court concludes otherwise.

### a) Purposeful Interjection

First, the Defendants argue that they have not purposefully interjected themselves into Arizona. However, as detailed above, Plaintiff has demonstrated that the Defendants engaged in intentional acts aimed at CP in Arizona which had a detrimental effect on CP in Arizona. Thus, the Defendants' arguments that they did not purposefully interject themselves into Arizona is unconvincing.

### b) The Defendants' Burden in Litigating

Next, the Defendants claim that litigating this matter in Arizona would impose a significant financial burden on them because NAB is a small, privately-held corporation with its principal place of business in Michigan, and Defendant Garden is also a Michigan resident. While "[a] defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, [ ] unless the 'inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction.'" *Panavision Int'l.* 141 F.3d at 1323 (quoting *Caruth,* 59 F.3d 126, 128–29). Although the Defendants would be inconvenienced by having to defend in Arizona, they have not shown that this burden is so great as to amount to a deprivation of due process. *See id.*

### c) Michigan's Sovereignty and Arizona's Interest

The Defendants further argue that exercising jurisdiction over them will conflict with the rights of Michigan to exercise jurisdiction over claims made against Michigan residents concerning events that took place in Michigan. The Court, however, finds no evidence that its exercise of jurisdiction will intrude upon Michigan's sovereignty. To the contrary, Arizona courts have the greater interest in adjudicating this dispute because the effect of the Defendants' alleged actions were felt in Arizona.

### d) Efficient Resolution

The Defendants also argue that because they, as well as their relevant documents and witnesses, are located in Michigan, the case would be more efficiently resolved there. While this factor focuses on the

location of evidence and witnesses, "[i]t is no longer weighed heavily given the modern advances in communication and transportation." *Id.* Because Plaintiff's witnesses and evidence are located in Arizona, this factor weighs in neither party's favor.

**e) Convenient and Effective Relief for Plaintiff**

In the Ninth Circuit, the plaintiff's convenience is given little weight. *See Dole Food Co., Inc.,* 303 F.3d at 1116; *Panavision Int'l,* 141 F.3d at 1324. Here, there is no evidence that litigating in Michigan will be unduly burdensome on Plaintiff. However, because Plaintiff is acting as the Court-appointed Receiver for CP as part of a receivership action initiated by the Arizona Attorney General, Arizona may be a more convenient and effective forum.

**f) Alternative Forum**

Plaintiff has not demonstrated the unavailability of an alternative forum. Based on the allegations in the Complaint and the parties' arguments, it appears that Michigan is an alternative forum.

**g) Balancing the Reasonableness Factors**

Taking all of the factors into consideration, the Court finds that although some factors weigh slightly in the Defendants' favor, overall, the Defendants have failed to present a compelling case that subjecting them to suit in Arizona is unreasonable.

In sum, Plaintiff has made a prima facie showing that the Defendants purposefully availed themselves of Arizona by engaging in wrongful conduct targeted at and having its effect on CP in Arizona and that his claims arise from such conduct. Further, the Defendants have not demonstrated that the Court's exercise of jurisdiction over them would be unreasonable. Ac-

cordingly, the Court finds that specific personal jurisdiction exists over the Defendants with respect to the claims asserted in Plaintiff's Complaint. The Court will therefore deny the Defendants' Motion to Dismiss based on lack of subject matter jurisdiction.

**B. Motion to Transfer Venue**

Should the Court deny their Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction, the Defendants request that the Court transfer venue pursuant to 28 U.S.C. § 1404(a) from the District of Arizona to Michigan.

■■■ Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In ruling on a motion to transfer, the Court may consider the following factors to determine whether transfer is appropriate: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000). As the party requesting the transfer, the Defendants bear the burden of proving that Michigan is the more appropriate forum for the action. *Id.* at 499. Applying these factors, the Court finds that they weigh in favor of the District of Arizona.

First, the parties have presented competing arguments as to the location where their agreements and negotiations occurred. Defendant claims that the events underlying Plaintiff's claims occurred in Michigan. Plaintiff, on the hand, asserts that all of the Defendants' tortious acts were directed at and felt in Arizona. Based on the facts presently before the Court, this factor favors neither party. Second, Plaintiff has brought a RICO claim and claims for conversion and unjust enrichment. Defendant has not demonstrated that the district court in Michigan is more familiar with the Arizona law governing these claims.

■ Third, although Michigan may be an alternative forum, Plaintiff elected to sue the Defendants in Arizona. In the context of a motion to transfer venue, Plaintiff's choice of his home forum is to be given "substantial deference." *Reiffin v. Microsoft Corp.*, 104 F.Supp.2d 48, 52 (D.D.C.2000).

Fourth, the parties' contacts with Arizona, and, specifically, those that relate to his claims, militate against transfer. PC was a corporation doing business in Arizona and paid the Defendants the allegedly unlawful fees out of its Arizona bank accounts. As discussed above, although the Defendants have not had a physical presence in Arizona, the effects of their alleged actions were felt in Arizona.

Fifth, the factors relating to the convenience of the parties and witnesses favor neither party. The Defendants claim that they reside in Michigan and any non-party witnesses who will explain their conduct are located in Michigan. They also assert that the underlying documents and records relating to Plaintiff's claims are in Michigan. Plaintiff maintains that PC was doing business in Arizona, Plaintiff is an Arizona receiver, ·that he has control of CP/NSI's business records, including records relating to the transactions between CP/NSI and the Defendants, and that the receivership is under the jurisdiction of the Arizona court Transfer "is not appropriate ... when the transfer merely shifts the inconvenience from one party to another." *Impra Inc. v. Quinton Instruments Co.*, 17 USPQ2d 1890, 1891, 1990 WL 284713 (D.Ariz.1990). Either party in this case would be inconvenienced by the litigation in the other's chosen forum. Further, aside from travel costs and costs of transmitting documents in Michigan to Arizona, Defendants have not shown that litigating this matter in Michigan would be less costly.

Finally, the Defendants have failed to present any evidence showing that compulsory process to compel witness attendance is lacking in Arizona, or that they will be unable to access evidence in Arizona.

Overall, the Court finds that the Defendants have failed to demonstrate that transferring the case to the district court in Michigan would better serve the convenience of the parties and witnesses and would serve the interest of justice. Accordingly, the Court will deny the Defendants' Motion to Transfer.

## III. Defendants' Motion to Dismiss Conversion Claim

Pursuant to Rule 12(b)(6), the Defendants move to dismiss Plaintiff's conversion claim.

### A. Legal Standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is disfavored and rarely granted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248–49 (9th Cir.1997). In ruling on a Rule 12(b)(6) Motion, the Court must construe the facts alleged in the complaint in the light most favorable to the plaintiff, and

must accept all well-pleaded factual allegations as true. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir.2000). Nonetheless, the plaintiff must still meet the pleading requirements of Rule 8, which requires the complaint to contain, "a short and plain statement of the claim showing that the pleader is entitled to relief." Dismissal under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts consistent with the allegations set forth in the complaint that would entitle the plaintiff to relief. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir.2004).

### B. Discussion

Under Arizona law, "conversion is defined as 'an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another.'" *Case Corp. v. Gehrke*, 208 Ariz. 140, 91 P.3d 362, 365 (App.2004) (quoting *Sears Consumer Fin. Corp. v. Thunderbird Prods.*, 166 Ariz. 333, 802 P.2d 1032, 1034 (App.1990)). In count two, Plaintiff alleges, in relevant part:

> 55. The Defendants have intentionally exercised control over Plaintiff's property of up to seven hundred thousand dollars ($700,000) that was obtained from Plaintiff as set forth in the foregoing allegations of this Complaint. Such exercise of control has seriously interfered with the Plaintiff's use of such funds in connection with the receivership action.
>
> . . . .
>
> 57. Plaintiff has been damages by not having possession and use of such funds since on or about February 2002, and is entitled to the return of those funds, including interest thereon.

(Compl.¶¶ 55, 57.) More specifically, the Complaint alleges that Defendant Gardner "forced" CP to pay a monthly consulting fee and other bonuses in order to continue processing its credit card transactions as NSI through NAB and GPS. (Compl. at ¶¶ 37, 39.) It further alleges that on March 14, 2002, Consoli sent $250,000 of CP's funds to Gardner; that on March 25, 2002, Consoli wire transferred $250,000 of CP funds to Gardner; and that on April 25, 2002, Consoli wire transferred $200,000 of CP funds to Gardner. (Compl. at ¶¶ 41–43.) The Defendants now urge the Court to dismiss this claim because: (1) it is untimely; and (2) CP knowingly consented to all payments, thereby barring the claim.

### 1. Statute of Limitations

First, the Defendants urge the Court to dismiss the conversion claim because it is untimely. Arizona Revised Statutes § 12–542 prescribes a two-year limitations period "[f]or detaining the personal property of another and for converting such property for one's own use." Under Arizona law, a conversion claim accrues "at the time of the wrongful taking and not at the time of the discovery by plaintiff of the taking or of the identity of the taker." *Jackson v. Am. Credit Bureau, Inc.*, 23 Ariz.App. 199, 531 P.2d 932, 934 (App.1975). The Defendants contend that, based on these allegations, the conversion claim accrued no later than March 14, 2002—the date of the first alleged payment. Because Plaintiff did not file the Complaint until April 5, 2004, more than two years after the first payment, the Defendants assert that the conversion claim is untimely.

Plaintiff, however, maintains that the claim is timely because the statute of limitations does not apply to him as the Court-appointed Receiver, and cites *Diamond Benefits Life Insurance Co. v. Resolute Holdings, Inc. (In re Diamond Benefits Life Ins. Co.)*, 184 Ariz. 94, 907 P.2d 63

(1995), as support. In that case, the State, through its Director of Insurance, brought a delinquency action against an insolvent insurance carrier and requested that the court appointed a special deputy receiver. The receiver then asserted a conversion claim against certain defendants. The defendants moved to dismiss the conversion claim, arguing that it was barred by the two-year statute of limitations. The district court granted the motion, but upon the plaintiff's motion for reconsideration, certified the question to the Arizona Supreme Court. Specifically, the Arizona Supreme Court addressed, "whether 'A.R.S. § 12–510', which exempts the state from being barred by the statutes of limitations prescribed in Title 12, Chapter 5 of the Arizona Revised Statutes, prevent[s] the dismissal of a conversion claim brought by the Plaintiff more than two (2) years after the date of the alleged conversion." *Id.*, 907 P.2d at 65. The Court held that it did.

In reaching this decision, the Court rejected the defendants' argument that because the receiver acted on behalf of the insurance company, and not on behalf of the state, the common law rule of *nullum tempus occurit regi* ("time does not run against the king"), codified in A.R.S. § 12–1510, was inapplicable. Instead, the Court found that the state's Director of Insurance, "appoints the receiver pursuant to a legislative scheme designed to protect the public from the dangers of a non-complying insurance company." *Id.* at 66. It noted that in bringing the delinquency proceedings, "[t]he receiver protects the public from the malfeasance of insureds and obtains reimbursement for the state's Insurance Guaranty Fund." *Id.* Thus, the Director of Insurance and the receiver "do not act on behalf of themselves of the insolvent company but, pursuant to the legislative mandate, on behalf of the citizens of this state." *Id.* at 67. Accordingly, the Court concluded that A.R.S. § 12–

510 prevented the dismissal of the receiver's conversion claim.

Plaintiff argues that the rationale of *Diamond Benefits* applies equally in this case. Plaintiff points out that like the deputy receiver in *Diamond Benefits*, he was appointed following an action commenced by the state. Specifically, he points out that the Arizona Attorney General requested his appointment as receiver in this case. Additionally, he points out that as receiver he is acting as an agent of the court. Plaintiff also proffers that, much like the state Director of Insurance in *Diamond Benefits*, the Arizona Attorney General in this case sought the appointment of a receiver in order to protect the members of the public who were victimized by CP, and, more broadly, to protect the public-at-large as part from racketeering. Plaintiff also contends that the appointment of the deputy receiver in *Diamond Benefits* and his appointment both arose from the state statutory schemes aimed at protecting the public.

The Defendants argue that *Diamond Benefits* is distinguishable from the instant case on several grounds. First, they argue that in *Diamond Benefits* the deputy receiver acted, in part, to obtain reimbursement for the Arizona Insurance Guaranty Fund, while in this case the state faces no liability or responsibility to cover the costs of CP's insolvency. Second, the Defendants contend that the deputy receiver in *Diamond Benefits* acted pursuant to a detailed statutory scheme governing insurance companies. They advance that the instant receivership is pursuant to a general receivership remedy under the consumer fraud statutes, A.R.S. § 44–1528 and § 44–1529, which provide a mechanism to prevent an entity engaging in consumer fraud from concealing its assets.

The Court, however, disagrees with the Defendants' restrictive reading of *Diamond Benefits*. In determining whether A.R.S. § 12–510 applied to the deputy receiver's conversion claim, the Court focused on whether the deputy receiver was acting on behalf of the insurance company or on behalf of the state and the public. As indicated above, the Court found that the receiver did not act on his own or the insurance company's behalf, but pursuant to a legislative mandate on behalf of the citizens of the state, and was therefore within the purview of § 12–510. Although the Court noted that the receiver could also recover funds to reimburse the State's Insurance Guaranty Fund, that finding was not determinative. In fact, nothing in the opinion indicates that the deputy receiver was acting for that purpose. In this case, Plaintiff's role as receiver mirrors that of the special deputy receiver in *Diamond Benefits*. Plaintiff was appointed by the superior court pursuant to the Arizona Attorney General's request and is an agent of the court. (Plaintiff's Appendix, ex. 4, "Order Appointing Receiver/Conservator" at 3.) The court's Order appointing him as receiver also grants him the authority to "institute ... such actions or proceedings in state, federal or foreign courts that the receiver deems necessary and advisable to preserve or recover the assets of the Receivership Defendants ...." (*Id.* at 7.) Additionally, in his role as Receiver, Plaintiff is not acting *for* the benefit of CP, but to recover funds owed to victims of CP's dealings. At oral argument, Plaintiff's counsel explained that any funds not distributed will be deposited in the State's Anti–RICO Fund. Moreover, Plaintiff is also acting pursuant to a statutory scheme as set forth in A.R.S. § 12–2314. (*Id.* at 2.) The Court therefore finds *Diamond Benefits* controlling. Accordingly, although Plaintiff brought the conversion claim after the ex-piration of the two-year statute of limitations period, because Plaintiff is acting on behalf of the state and for the benefit of the public, A.R.S. § 12–510 prevents dismissal of the claim.

## 2. Consent

Second, the Defendants contend that Plaintiff's conversion claim fails as a matter of law because CP consented to the payments. As set forth above, "conversion is any act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with his rights therein." *Scott v. Allstate Ins. Co.*, 27 Ariz.App. 236, 553 P.2d 1221, 1225 (1976). Arizona courts recognize that "an act which would otherwise constitute a conversion may be precluded from having that effect by the plaintiff's consent to the act, either express or implied." *Id.*; *see* Restatement (Second) of Torts § 252 (1965) ("One who would otherwise be liable to another for trespass to a chattel or for conversion is not liable to the extent that the other has effectively consented to the interference with his rights.").

The Defendants argue that "the Complaint admits that CP agreed to the payments and that one of CP's principals made the transfers to Defendants." (Reply at 2.) Thus, the Defendants contend that CP, through its owners, consented to the payments, thereby barring Plaintiff's conversion claim.

In response, Plaintiff argues that the Complaint alleges that CP's payment of the consulting fees was not consensual. According to Plaintiff, after the Defendants' fraudulent scheme went into effect in February 2002, and GPS began providing credit card processing services for NSI, the Defendants were able to demand the unwarranted consulting fees. Plaintiff explains that, "[t]o refuse to pay would lead to the cancellation of credit card ser-

vices provided through Defendants' relationship with GPS." (Resp. at 7.) Thus, Plaintiff asserts that CP "involuntarily provided" the consulting fees to the Defendants and that CP's agreement to pay the fees was obtained through duress, thereby negating any consent.[3] The Defendants, however, argue that this amounts to no more than economic duress found in any transaction, which does not nullify CP's consent.

■ Reviewing the Complaint, Plaintiff has alleged that "Defendants *forced* CP to pay them a monthly 'consulting fee' of up to [$250,000] per month to obtain Defendants' agreement to process CP's credit card transactions." (Compl. at ¶ 2 (emphasis added).) The Complaint also alleges that Defendant Gardner "demanded" the fees and "required" CP to pay in order to continue processing credit card sales for CP as NSI. (Compl. at ¶¶ 37, 39.) He alleges that, although Defendant Gardner did not provide any consulting services, CP paid him $700,000 in three installments during March and April 2002, "in order to insure CP could continue processing its credit card sales." (Compl. at ¶¶ 41–44.) Thus, construing these allegations in the light most favorable to Plaintiff, he has alleged that the Defendants "forced" CP to pay the $700,000 in fees, and CP's payments were therefore involuntary. Although the Defendants argument regarding whether Plaintiff can prove anything more than economic duress is well-taken, it raises fact-driven questions which exceed the scope of a 12(b)(6) motion, and is therefore premature. Accordingly, the Court finds that at this stage of litigation, Plaintiff has sufficiently alleged a conversion claim against the Defendants. The Court will therefore deny the Defendants' Motion to Dismiss Conversion Claim.

## IV. The Defendants' Motion to Dismiss RICO Claim

The Defendants also move to dismiss count one of Plaintiff's Complaint on the basis that Plaintiff did not adequately allege predicate acts, a pattern of racketeering activity, or the existence of a RICO enterprise.

Arizona Revised Statutes § 13–2314.04(A) creates a private cause of action in favor of "[a] person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity, or by a violation of section 13–2312 involving a pattern of racketeering activity[.]" Pursuant to A.R.S. § 13–2314.04(T)(3), "pattern of racketeering activity" is defined as either:

(a) At least two acts of racketeering as defined in section 12–2301, subsection D, paragraph 4, subdivision (b), item (iv), (v), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xvi), (xviii), (xix), (xx), (xxvi) that meet the following requirements:

(i) The last act of racketeering activity that is alleged as the basis of the claim occurred within five years of a prior act of racketeering.

(ii) The acts of racketeering that are alleged as the basis of the claim were related to each other or to a common organizing principle, including the affairs of an enterprise. Acts of racketeering are related if they have the same or similar purposes, results, participants, victims or methods of commission or are

---

**3.** Plaintiff also proffers an alternative theory for his conversion claim, essentially alleging that CP's owners "wrongfully took CP Direct's assets (i.e., a total of $700,000) and then transferred the money to Defendant Gardner's personal Smith Barney accounts as 'payment' for 'consulting fees' that were never rendered to CP Direct." Plaintiff has failed to point to any allegations in the Complaint supporting this theory.

otherwise interrelated by distinguishing characteristics.

(iii) The acts of racketeering that are alleged as the basis of the claim were continuous or exhibited the threat of being continuous.

(b) A single act of racketeering as defined in section 13–2301, subsection D, paragraph 4, subdivision (b), item (i), (ii), (iii), (xi), (xii), (xiv), (xxi), (xxii), (xxiii), (xxv), (xxvii) or (xxviii).

In count one, Plaintiff alleges that the Defendants engaged in a pattern of racketeering involving the predicate offenses of: (1) forgery, (2) theft by extortion, and (3) fraudulent schemes. (Compl.¶ 30.) The Defendants attack Plaintiff's claim on the ground that he failed to allege facts showing that such offenses occurred or that the Defendants, as opposed to CP's former owners, engaged in them. (Motion at 4.)

 Plaintiff's first alleged act of racketeering is forgery. Under Arizona law, a person commits forgery "if, with intent to defraud, the person:

1. Falsely makes, completes or alters a written instrument; or

2. Knowingly possesses a forged instrument; or

3. Offers or presents, whether accepted or not, a forged instrument or one that contains false information."

A.R.S. § 13–2002(A). Plaintiff asserts that the Complaint alleges that the Defendants "directed the creation of false documents, that they possessed the documents and presented them for the purpose of pecuniary gain." (Resp. at 8.) As to Plaintiff's allegation that the Defendants committed forgery by directing CP's owners to create false documents, Plaintiff fails to cite any authority recognizing that the act of directing someone to create a false document amounts to forgery. The Court therefore agrees with the Defendants that

this allegation does not support a forgery claim under A.R.S. § 13–2002. Citing to paragraph 35 of the Complaint, Plaintiff argues that the Complaint alleges that the Defendants "took a phony merchant account application for NSI and presented it to GPS, in order to allow the processing of NSI's credit card transactions." Construing these allegations in the light most favorable to Plaintiff, he has alleged that the Defendants possessed forged documents and offered them to GPS, which is sufficient to state a claim under § 13–2002.

Second, the Defendants contend that Plaintiff's fraudulent scheme allegation fails because CP knew about any misrepresentations as a result of their involvement in the purported scheme and because Plaintiff has failed to allege that CP relied on any of the purported misrepresentations. Under A.R.S. § 13–2310(A), a person is guilty of engaging in a fraudulent scheme or artifice, if "pursuant to a scheme or artifice to defraud, [the person] knowingly obtains any benefit by means of false pretenses, representations, promises or material omissions[.]" Subsection B of this statute provides, "Reliance on the part of any person shall not be a necessary element of the offense[.]" A.R.S. § 13–2310(B).

Plaintiff asserts that the Complaint alleges that the Defendants directed CP to create false documents which the Defendants then presented to GPS without disclosing that NSI was a non-existent company. Plaintiff argues that "[a]s a result of this fraudulent scheme, Defendants were able to maintain a significant volume of their business [and] Defendant Gardner was able to extort $700,000 from CP[.]" (Resp. at 9.) The Court finds that these allegations are sufficient to survive a motion to dismiss.

Third, the Defendants argue that Plaintiff failed to adequately allege theft by

extortion. Under Arizona law, "A person commits theft by extortion by knowingly obtaining or seeking to obtain property or service by means of a threat to do in the future any of [the listed offenses]." A.R.S. § 13–1804(A). The Defendants claim that Plaintiff has failed to allege that they "threatened anyone with anything, must less threatened to do something listed in [A.R.S. § 13–1804]." (Motion at 5.) However, as Plaintiff points out, the Complaint alleges that the Defendants demanded and forced them to pay monthly consulting fees to continue processing their credit card transactions although the Defendants did not provide consulting services. Plaintiff has also alleged that discontinuing their ability to process credit card transactions through GPS would have detrimentally affected their business. Under A.R.S. § 13–1804(A)(3), a threat to cause damage to property can support a theft by extortion claim. Based on the allegations that the Defendants knowingly obtained $700,000 by threatening to cause damage to CP's business, Plaintiff has sufficiently pled theft by extortion as a predicate offense.

The Defendants also argue that dismissal is appropriate because Plaintiff cannot demonstrate that the predicate acts proximately caused injury to CP. Plaintiff has alleged that the Defendants' racketeering scheme resulted in the improper transfer of $700,000 from CP to the Defendants. Thus, Plaintiff has alleged causation sufficient to defeat a motion to dismiss.

■ Next, the Defendants assert that Plaintiff failed to allege a "pattern of racketeering activity." As part of establishing a pattern of racketeering activity, Plaintiff must demonstrate that, "[t]he acts of racketeering that are alleged as the basis of the claim were continuous or exhibited the threat of being continuous." A.R.S. § 13–2314.04(T)(3)(a)(iii). Plaintiff can fulfill this continuity requirement by showing ei-

ther "a closed period of repeated conduct, or past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Lifeflite Med. Air Transp.*, 198 Ariz. 149, 7 P.3d 158, 162 (App.2000) (interpreting Arizona's racketeering statute consistent with analogous federal statute and applying continuity requirement). The Defendants argue that Plaintiff's allegations cannot satisfy the continuity requirement. Reviewing the Complaint, Plaintiff has alleged that the Defendants demanded that CP pay up to $250,000 *each month* in order to continue processing its credit card transactions through NAB. The Complaint also alleges that the scheme only ended with the filing action by the State of Arizona. Thus, Plaintiff has alleged that the Defendants' acts included a threat of repetition extending into the future. *See H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. Plaintiff has therefore sufficiently alleged continuity of the racketeering acts.

Finally, the Defendants contend that Plaintiff has not sufficiently alleged a RICO enterprise. Section 13–2314.04 creates a private cause of action in favor of "[a] person who sustains reasonably foreseeable injury to his person, business or property by a pattern of racketeering activity, *or by a violation of § 13–2312 involving a pattern of racketeering activity* . . . ." A.R.S. § 13–2314.04(A). Section 13–2312 provides, in relevant part:

B. A person commits illegal conducting an enterprise if such person is employed by or associated with any enterprise and conducts such enterprise's affairs through racketeering or participates directly or indirectly in the conduct of any enterprise that the person knows is being conducted through racketeering.

Pursuant to A.R.S. § 13–2301(D)(2), enterprise is defined as "any corporation, partnership, association, labor union or other legal entity or any group of persons associated in fact although not a legal entity."

As to the existence of a RICO enterprise, Plaintiff's Complaint alleges:

29. At all times material herein, the Defendants have been employed by or have been associated with an enterprise including individuals, partnerships, corporations, associations and other legal entities and/or a group of individuals associated in fact although not a legal entity within the meaning of A.R.S. § 13–2301(D)(1) and (4). This enterprise operated from on or about January 1, 2002 until May 22, 2002, when the Plaintiff was appointed Receiver. All of the various associates of the racketeering enterprise, including the Defendants, functioned as a continuing unit. Each of the Defendants and other associates of the enterprise performed a role that perpetuated and furthered the enterprise and which furthered the activities of the enterprise.

Generally, "establishing the existence of an associated-in-fact enterprise requires proof (1) of an ongoing organization, formal or informal, and (2) that the various associates function as a continuing unit." *Chang v. Chen,* 80 F.3d 1293, 1297 (9th Cir.1996). As to the first requirement, "a RICO enterprise must have an ascertainable structure separate and apart from the structure inherent in the conduct of the pattern of racketeering activity." *Chang v. Chen,* 80 F.3d 1293, 1295 (9th Cir.1996). As the Ninth Circuit explained in *Chang::*

At a minimum, to be an enterprise, an entity must exhibit "some sort of structure ... for the making of decisions, whether it be hierarchical or consensual." *[United States v.] Riccobene,* 709 F.2d [214] at 222 [(3d Cir.1983)]. The structure should provide "some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis." *Id.* The structure requirement, however, "does not mean that every decision must be made by the same person, or that authority may not be delegated." *Id.*

It is also not necessary to show that the organization "has some function wholly unrelated to the racketeering activity." *Id.* at 223–24. Rather, it is sufficient to show that the organization has an existence beyond that which is merely necessary to commit the predicate acts of racketeering. *Id.* at 224. "The function of overseeing and coordinating the commission of several different predicate offenses and *other activities* on an on-going basis is adequate to satisfy the separate existence requirement."

*Chang,* 80 F.3d at 1299 (emphasis in original).

■■■ The Defendants attack the sufficiency of such allegations on several bases. First, they argue that Plaintiff has failed to allege an enterprise because, as president of NAB, he could not form an enterprise with NAB. Citing *Bachman v. Bear, Stearns & Co.,* 178 F.3d 930, 932 (7th Cir.1999), the Defendants assert that "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." However, as Plaintiff points out, in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), the Supreme Court recognized that a "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." Thus, the fact that Gardner was president of NAB does not

preclude him from forming an enterprise with NAB.

 The Defendants also argue that the Complaint lacks any factual allegations supporting the existence of an enterprise. They contend that the only alleged members of the enterprise are Gardner and his company, NAB, and that Plaintiff has not alleged that NAB did anything separately from Gardner. The Defendants further assert that Plaintiff is unable to provide any allegations of a decision-making structure, an organizational structure designed to maintain the purported enterprise, or any system to distribute the allegedly-wrongful payments. The Court agrees with the Defendants. In his Response, Plaintiff is unable to point to any factual allegations in his Complaint aside from paragraph 29. As the excerpt above demonstrates, paragraph 29 merely contains conclusory allegations that a RICO enterprise existed. In deciding a motion to dismiss under Rule 12(b)(6), the Court does not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981). Absent specific facts demonstrating a structured association, Plaintiff's Complaint fails to plead a cognizable RICO enterprise. *See Chang*, 80 F.3d at 1300; *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083–84 (9th Cir.2000). Consequently, the Court will dismiss count one of Plaintiff's Complaint without prejudice and with leave to amend.

## V. Conclusion

**IT IS THEREFORE ORDERED** that the Defendants' Motion to Dismiss Complaint (1) for Improper Venue, (2) for Lack of Personal Jurisdiction, or (3) Transfer Venue (Doc. # 6) is **DENIED.**

**IT IS FURTHER ORDERED** that the Defendants' Motion to Dismiss RICO Claim (Doc. # 7) is **GRANTED.** Count one of Plaintiff's Complaint is dismissed without prejudice and with leave to amend. Plaintiff shall file any amended Complaint within 10 business days after the filing date of this Order.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Dismiss Conversion Claim (Doc. # 8) is **DENIED.**